`UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

United States of America,

       Plaintiff,

       v.

Edward G. Robinson,

       Defendant.

Criminal No. 06-95 (JRT/FLN)

**REPORT AND
RECOMMENDATION**

Andrew R. Winter, Assistant United States Attorney, for the Government.
Jordan S. Kushner, for Defendant.

      **THIS MATTER** came before the undersigned United States Magistrate Judge on April 19, 2006, on Defendant's Motion to suppress witness identifications [#27]; Defendant's Motion to suppress evidence from search and seizure [#29]; and Defendant's Motion to suppress statements [#36]. At the hearing, the Court received testimony from Sergeant Tom Bergren of the Saint Paul Police Department and Officer Mark Nelson of the Saint Paul Police Department. The Government submitted two exhibits at the hearing. Exhibit number one is a search warrant that was issued on February 17, 2006. Exhibit number two is a photographic lineup. The matter was referred to the undersigned for Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. For the reasons which follow, this Court recommends Defendant's Motions be **GRANTED in part** and **DENIED in part**.

SCANNED
MAY 2 5 2006
U.S. DISTRICT COURT MPLS

## I.   FINDINGS OF FACT

### A.   Testimony of Sergeant Tom Bergren

Sergeant Tom Bergren of the St. Paul Police Department testified at the suppression hearing on April 19, 2006.  Sgt. Bergren is a homicide investigator for the St. Paul Police Department, and has been employed with the St. Paul Police Department for 26 years.  Sgt. Bergren testified that he first came into contact with Defendant in late 2005 when Defendant was picked up as a suspect in a homicide that Sgt. Bergren was investigating.  Sgt. Bergren testified that he spoke with Defendant for approximately three minutes when Defendant was in custody at the Ramsey County Jail. Sgt. Bergren testified that he spoke to Defendant in an interview room.  Sgt. Bergren testified that Defendant immediately informed him that his attorney advised him not to talk about the homicide investigation.  Sgt. Bergren testified that he asked Defendant if he would be willing to meet with Sgt. Bergren and Defendant's attorney to talk about the case.  Defendant indicated that he would be willing to meet with Sgt. Bergren and Defendant's attorney to talk about the investigation. Sgt. Bergren testified that he requested contact information from Defendant, and in response Defendant informed him that he resided at ████████ in St. Paul. Defendant also provided Sgt. Bergren with a telephone number.  Sgt. Bergren indicated that he and Defendant also talked about Defendant's girlfriend.  Sgt. Bergren testified that he did not make an audio recording of this incident because it was simply a conversation, and not an interview.  Sgt. Bergren testified that he would have recorded the incident had it been an interview.  Sgt. Bergren testified that Defendant was never given a *Miranda* warning and that, although Defendant identified his attorney, Sgt. Bergren did not attempt to contact Defendant's attorney.

2

**B.   The Application for the Search Warrant Issued on February 17, 2006.**

Officer Mark Nelson is a police officer with the City of St. Paul and has been so employed for approximately six years. Officer Nelson is currently assigned to the East Metro Drug Task Force, which investigates narcotics activity in Ramsey County. In his application for a search warrant for the premises at ▮▮▮▮▮▮▮, Officer Nelson stated that he had been in contact with a confidential informant ("CI"). The CI told Officer Nelson that Defendant lived at ▮▮▮▮▮▮▮ ▮▮ n St. Paul, and that Defendant was selling cocaine from that address. The CI told Officer Nelson that Defendant sold large amounts of cocaine within the city of St. Paul, and that the CI had personally been inside ▮▮▮▮▮▮ numerous times to purchase narcotics from Defendant. (Ex. 1.)

Officer Nelson stated in his application that he conducted an investigation and verified that Defendant resided at ▮▮▮▮▮▮ by checking Defendant's prior arrest record. While checking Defendant's prior arrest record, Officer Nelson observed that on December 27, 2005, Defendant was arrested for aggravated assault and listed ▮▮▮▮▮▮▮ as his address. On February 16, 2006, Officer Nelson served Xcel Energy with a subpoena regarding the subscriber information for ▮▮▮▮▮▮ nd determined that Ebony Brown was listed as the subscriber at this address. Officer Nelson then reviewed the report written on December 29, 2005, by Sgt. Bergren, which stated that Defendant told Sgt. Bergren that his girlfriend's name was Ebony Brown. (Ex. 1.)

In his application for a search warrant, Officer Nelson stated that he conducted a controlled buy from Defendant at ▮▮▮▮▮▮ "within the last 48 hours." (Ex. 1.) Officer Nelson stated that he utilized the CI to perform the controlled buy and that he searched the CI prior to the initiation of the controlled buy. Officer Nelson stated that he supplied the CI with buy money and

3

he followed the CI to ███████████ Officers assisting Officer Nelson observed the CI walk in

the front door of the apartment building and a short time later officers observed the CI leave the

apartment building, get into his vehicle, and drive away. Officer Nelson stated that he followed the

CI and met him at a location in St. Paul. The CI informed Officer Nelson that he exchanged a

specified amount of money for a specified amount of narcotics, and Officer Nelson determined that

the bag of narcotics Defendant sold the CI tested positive for cocaine. (Ex. 1.)

In his application for a search warrant, Officer Nelson requested permission to conduct the

search without making an announced entry. Officer Nelson noted that he had reviewed Defendant's

criminal history, and saw that Defendant had been arrested numerous times within the last four years.

Officer Nelson stated that he saw that Defendant "several prior convictions for violent crimes

including . . . felony [third] degree assault . . . terroristic threats . . . [and] domestic battery." (Ex. 1.)

Officer Nelson noted that he was requesting an unannounced entry because it was

> necessary to prevent the loss, destruction, or removal of the objects of the search
> primarily because narcotics evidence in this setting is so easily destroyed or disposed
> of [and was] . . . necessary to protect the safety of the peace officers because attempts
> are often made to protect drugs and/or monetary profit from the sale of drugs with
> dangerous weapons [and was] . . . necessary to protect peace officers based on
> [Defendant's] criminal history.

(Ex. 1.) The search warrant was issued, with a no-knock provision, on February 17, 2006. (Ex. 1.)

The search warrant was executed on February 27, 2006, and officers seized documents with

Defendant's name on them, a firearm, a shoe box containing a scale, baggies and suspected crack

cocaine, and miscellaneous photographs. (Ex. 1.)

4

## C.   Testimony of Officer Mark Nelson

St. Paul Police Officer Mark Nelson also testified at the suppression hearing. Officer Nelson testified that in February 2006 Defendant was under investigation for narcotics trafficking. Officer Nelson testified that he was the lead investigator in this case. Officer Nelson testified that he believed that the facts in the search warrant application were true, and that the judge who ultimately issued the warrant did not request any additional information from him.

Officer Nelson testified that he requested a "no-knock" provision in the search warrant, which allowed the executing officers to enter the premises without first knocking and announcing their presence. Officer Nelson testified that he requested the no-knock provision in the search warrant because the type of narcotic they were attempting to find was crack-cocaine, which was easily destroyed during a warrant entry. Officer Nelson further testified that he requested a no-knock provision in the warrant because, prior to requesting the warrant, Officer Nelson reviewed Defendant's criminal history and discovered several arrests for violent offenses. Officer Nelson testified that the connection between these two facts created an officer safety issue because Officer Nelson was concerned that they were attempting to enter the apartment of a potentially dangerous individual.

Officer Nelson testified that he participated in the execution of the search warrant, and a no-knock entry was effectuated on February 27, 2006, at 10:00 a.m. Officer Nelson testified that no one was present in the residence at that time. Officer Nelson testified that crack-cocaine and a firearm were seized as a result of the execution of the search warrant. Officer Nelson testified that a copy of the warrant was left at the residence.

5

Officer Nelson testified that he prepared a photographic lineup during his investigation of this case. The photographic lineup was received as exhibit number two. Officer Nelson testified that the County provides the St. Paul police department with access to booking photographs, and that in order to create the photographic lineup he took a photograph of Defendant and matched it with five other booking photographs with the same gender and age as Defendant. Officer Nelson testified that he showed the photographic lineup to four witnesses, and only one witness positively identified Defendant.

Officer Nelson testified that, before showing the photographic lineup to these witnesses, he told the witness to look at the photograph and asked the witnesses if they recognized anyone in the lineup. Officer Nelson testified that he did not do or say anything to highlight number five, which was Defendant's photograph. Officer Nelson testified that one individual positively identified Defendant. That individual was Christopher Testerman, the caretaker of the apartment building at ▉▉▉▉▉▉▉▉ Officer Nelson interviewed Mr. Testerman at the apartment building office, which is located one building over from ▉▉▉▉▉▉ On cross-examination, Officer Nelson testified that he could not remember if he had any conversation with Mr. Testerman before showing him the photographic lineup, but he was sure that he identified himself as a police officer. Officer Nelson testified that Mr. Testerman stated that he recognized number five as an individual who he had seen coming from ▉▉▉▉▉▉ Mr. Testerman stated that he had last seen Defendant two weeks previous. Mr. Testerman stated that he was certain of his identification, and he signed his name under number 5.

On cross-examination Officer Nelson testified that he did not include any of the specifics regarding Defendant's prior violent convictions in his application for the search warrant.

6

Officer Nelson testified that he did not talk to Sgt. Bergren about Defendant before submitting the search warrant application. Officer Nelson testified that he did review Sgt. Bergren's report and remembered from that report that Defendant stated that his girlfriend was Ebony Brown. Officer Nelson testified that there was no evidence in the report that indicated that Defendant was belligerent towards Sgt. Bergren, and that the report did not indicate either way whether Defendant was cordial during his conversation with Sgt. Bergren. Officer Nelson testified that there was no mention in the search warrant about any weapons, and that the warrant did not indicate anything about the amount of narcotics Officer Nelson expected to find.

Officer Nelson testified that additional surveillance of the address was conducted between the time the warrant issued, on February 17, 2006, and the time it was executed on February 27, 2006, but that no drug activity was uncovered as a result of the additional surveillance. Officer Nelson testified that he was not in the apartment at ███████ at the time of the search nor was he present at the time of arrest. Officer Nelson testified that Defendant was arrested a few hours after the search warrant was executed. Defendant was walking outside of ███████ on the east side of the building when he was arrested. Upon arrest Defendant was searched and a key to the apartment at ███████ was discovered. Officer Nelson further testified that, when the search warrant was executed, a firearm was discovered on top of documents that had Defendant's name on them.

Defendant now moves to suppress the witness identification made by Mr. Testerman, on the grounds that this identification was the product of unnecessarily suggestive methods. In addition, Defendant moves to suppress the statement he made to Sgt. Bergren. Defendant argues that any statements he made were made while he was in custody and had invoked his right to remain silent

and to counsel. Defendant argues that the questions that Sgt. Bergren asked Defendant were not questions that fell within the routine booking exception, and therefore Defendant's statements in response to these questions must be suppressed.

Finally, Defendant moves to suppress any evidence derived from the search of ███ ████████████████████ Defendant argues that the evidence obtained as a result of the search should be suppressed for four reasons. First, Defendant argues that "any searches and seizures were conducted without the requisite probable cause to believe that the locations or persons to be searched had or contained incriminating evidence, and any warrant issued was not supported by probable cause." (Docket No. 29.) Second, Defendant argues that the search violated the Fourth Amendment requirement "that police knock and announce their presence prior to entering the premises, and the warrant was not supported by the requisite reasonable suspicion to support an authorization to ignore the knock and announce requirement." (Docket No. 29.) Third, Defendant argues that the warrants were based on false information that tainted the warrants. Fourth, Defendant argues that "as a result of at least ten days delay between issuance and execution of the search warrant of [Defendant's] alleged residence, any probable cause that could have arguably justified the issuance of the warrant had become stale, thereby negating the requisite probable cause." (Docket No. 29.)  Finally, Defendant argues that the police lacked probable cause to arrest Defendant, and therefore all evidence obtained as a result of his arrest should be suppressed.

The Court recommends that Defendant's motion to suppress the witness identification be denied, that Defendant's motion to suppress the statement to Sgt. Bergren be granted, and that Defendant's motion to suppress the evidence obtained as a result of the search on ████████████ ███ be denied.

8

## II.   CONCLUSIONS OF LAW

**A.      The Witness Identification Was Not The Product of Unnecessarily Suggestive Methods, and Is Admissible.**

Defendant now moves to suppress the witness identification made by Mr. Testerman, on the grounds that this identification was the product of unnecessarily suggestive methods.  The Fifth Amendment Due Process Clause prohibits identification testimony that is derived from impermissibly suggestive procedures that might lead to an irreparably mistaken identification.  See Neil v. Biggers, 409 U.S. 188, 196-98 (1972).  The Supreme Court has stated that "[i]t is . . . apparent that the primary evil to be avoided is 'a very substantial likelihood of irreparable misidentification.'" Biggers, 409 U.S. at 198 (quoting Simmons v. United States, 390 U.S. 377, 384 (1968)).  Since "[i]t is the likelihood of misidentification [that] violates a defendant's right to due process," courts must focus on the reliability of the identification.  See Biggers, 409 U.S. at 198; United States v. Briley, 726 F.2d 1301, 1306 (8th Cir. 1984) ("In determining whether an identification procedure violates due process, the primary focus is on the reliability of the identification.")  A due process challenge to the use of an identification requires a two-step inquiry. The Court must first determine (1) whether the challenged procedure was " suggestive;" and (2) if so, the Court must determine whether "considering the totality of the circumstances, the suggestive procedures gave rise to a substantial likelihood of irreparable misidentification."  United States v. Briley, 726 F.2d 1301, 1306 (8th Cir. 1984); see Graham v. Solem, 728 F.2d 1533, 1541 (8th Cir. 1984).

In the present case, the photographic lineup utilized was not suggestive.  Officer Nelson testified that, in preparing the lineup, he utilized booking photographs of persons who were the same

gender and age as the Defendant. All six men pictured in the photographic lineup are African-American, and have the same general physical characteristics. The Court has reviewed the photographic lineup and has determined that there is nothing inherently suggestive about the lineup. (See Ex. 2.)

In addition, Officer Nelson testified that he did not do anything or say anything to highlight Defendant's photograph. Although Officer Nelson testified on cross examination that he could not remember if he had any conversation with Mr. Testerman immediately before showing him the photographic lineup, Officer Nelson testified that he did not do anything or say anything to highlight Defendant's photograph prior to showing the photographic line-up to Mr. Testerman. Mr. Testerman stated that he was certain of his identification, and he signed his name under photograph number five. Looking at the evidence presented regarding the photographic lineup, the Court concludes that the identification of Defendant by Mr. Testerman is reliable, and that the photographic lineup was not suggestive. Therefore, the Court recommends that Defendant's Motion to suppress witness identifications [#27] be denied.

**B.    The Statements Defendant Made To Sergeant Bergren While In Custody Without The Benefit of A *Miranda* Warning Should Be Suppressed.**

Defendant moves to suppress the statements he made to Sgt. Bergren. Defendant argues that any statements he made were made while he was in custody and had invoked his right to remain silent and to counsel. Defendant argues that the questions that Sgt. Bergren asked Defendant were not questions that fell within the routine booking exception, and therefore Defendant's statements in response to these questions must be suppressed.

*Miranda v. Arizona* and its progeny require that a *Miranda* warning be given any time a suspect is in custody and is subject to interrogation by law enforcement officials. 384 U.S. 436, 484

(1966). The Supreme Court has defined interrogation to include "express questioning [and] any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301 (1980). Pursuant to *Miranda v. Arizona*, 384 U.S. at 444, "an individual must be advised of the right to be free from compulsory self-incrimination, and the right to the assistance of an attorney, any time a person is taken into custody for questioning." United States v. Griffin, 922 F.2d 1343, 1347 (8th Cir.1990). Any statements taken in violation of this directive are subject to suppression. *Miranda*, 384 U.S. at 476.

The routine booking question exception "exempts from *Miranda*'s coverage questions to secure the biographical data necessary to complete booking or pretrial services." Pennsylvania v. Muniz, 496 U.S. 582, 601 (1990) (internal quotations omitted). In Muniz, the defendant was asked his name, address, height, weight, eye color, date of birth, current age, and the date of his sixth birthday. Id. at 590. The content of the defendant's answer to the sixth birthday question was incriminating, because he did not know the proper date of his sixth birthday. Id. at 593. The Court concluded that the sixth birthday question "required a testimonial response" and that "the incriminating inference of impaired mental faculties [of the defendant] stemmed, not just from the fact that [the defendant] slurred his response, but also from a testimonial aspect of that response." Id. at 600.

In the present case, Defendant was in custody at the time that he made the statements to Sgt. Bergren, as he was in a holding cell at the Ramsey County Jail in connection with a homicide investigation. Defendant was subject to express questioning by Sgt. Bergren concerning his contact information; therefore, Defendant was subject to interrogation while in custody. It is undisputed that

11

Defendant was never given a *Miranda* warning and that Defendant asserted his right to counsel at the outset of the interrogation. The questions Sgt. Bergren asked Defendant were not "questions to secure the biographical data necessary to complete booking or pretrial services." Muniz, 496 U.S. at 601 (internal quotations omitted). Therefore, the questions Sgt. Bergren asked Defendant are more akin to the sixth birthday question in Muniz than they are to "questions to secure the biographical data necessary to complete booking or pretrial services." Muniz, 496 U.S. at 601(internal quotations omitted). Like the sixth birthday question in Muniz, Sgt. Bergren had no interest in Defendant's answer to his question, as Defendant had already been booked at the Ramsey County Jail and had already given his contact information as a result of the booking process. Furthermore, Officer Nelson noted that, when Defendant was arrested for aggravated assault on December 27, 2005, Defendant listed ███████████ as his address. Therefore, when Sgt. Bergren subsequently interrogated Defendant and asked Defendant for his contact information, he was not interested in the actual information because he already had access to it. While, at the time, Sgt. Bergren did not want the information for investigative purposes, the information turned out to be subsequently incriminating, as Defendant admitted that his girlfriend was named Ebony Brown and this information was used to connect Defendant to Ebony Brown's residence at ████████ ███ Defendant was in custody, he was subject to interrogation, and he was not given a *Miranda* warning prior to being interrogated; therefore, any statements he made to Sgt. Bergren should be suppressed.

However, the fact that these statements should be suppressed is not the end of the inquiry. The Supreme Court has stated that

> police do not violate a suspect's constitutional rights (or even the *Miranda* rule) by negligent or even deliberate failures to provide the suspect with the . . . warnings

12

> prescribed by *Miranda*. Potential violations occur, if at all, only upon the admission
> of unwarned statements into evidence at trial . . . Thus, unlike unreasonable searches
> under the Fourth Amendment . . . there is, with respect to mere failures to warn,
> nothing to deter. There is . . . no reason to apply the 'fruit of the poisonous tree'
> doctrine of *Wong Sun*.

United States v. Patane, 542 U.S. 630, 641-42 (2004).  According to Patane, the fruit of the

poisonous tree analysis does not apply where a defendant merely made a statement without the

benefit of a *Miranda* warning.  Patane stands for the proposition that the remedy for a *Miranda*

violation is to exclude the unwarned statement from use as evidence at trial in the prosecutions case

in chief.  The remedy for a *Miranda* violation does not extend to the fruits of unwarned testimony.

For example, the Supreme Court stated that "statements taken without *Miranda* warnings (though

not actually compelled) can be used to impeach a defendant's testimony at trial . . . though the fruits

of actually compelled testimony cannot."  Patane, 542 U.S. at 639.

The Court must first determine whether Defendant's statements were simply taken without

*Miranda* warnings, though not actually compelled, or whether his statements were actually

compelled.  Therefore, the Court must determine whether Defendant's statements were made

involuntarily.  If the statements are induced by threats, promises, or in any other way in which the

suspect's will is overborne, the statements are not voluntary and are inadmissible.  See Haynes v.

Washington, 373 U.S. 503, 513 (1963).  The voluntariness inquiry centers upon: (1) the conduct of

law enforcement officials in creating pressure; and (2) the suspect's capacity to resist that pressure.

Jorgenson, 871 F.2d at 729, citing Colorado v. Connelly, 479 U.S. 157 (1986).  Coercion by a state

actor is a necessary element in satisfying this test.  See Russell v. Jones, 886 F.2d 149, 151

(8th Cir.1989).

In the present case, there is no evidence that the conduct of Sgt. Bergren created pressure on Defendant, that the statements were induced by threats or promises, or that Defendant's will was otherwise overborne. The Court concludes that Defendant's statements were not actually compelled, and were simply taken without the benefit of *Miranda* warnings. Therefore, to the extent that Defendant seeks to suppress the fruits of the search on ████████████, because Defendant's statement is how the St. Paul police department connected Defendant to the residence at ████ ████ according to <u>Patane</u>, only Defendant's statements will be suppressed. To the extent that any fruits were obtained as a result of the unwarned statements, those fruits are admissible.

## C.    The Search Warrant Issued In the Present Case Was Valid

Defendant moves to suppress any evidence derived from the search of ████████████ ████████ Defendant argues that the evidence obtained as a result of the search should be suppressed for four reasons. First, Defendant argues that "any searches and seizures were conducted without the requisite probable cause to believe that the locations or persons to be searched had or contained incriminating evidence, and any warrant issued was not supported by probable cause." (Docket No. 29.)  Second, Defendant argues that the search violated the Fourth Amendment requirement "that police knock and announce their presence prior to entering the premises, and the warrant was not supported by the requisite reasonable suspicion to support an authorization to ignore the knock and announce requirement." (Docket No. 29.) Third, Defendant argues that the warrants were based on false information that tainted the warrants. Although Defendant made this claim in his initial motion papers, he appears to have abandoned it. As there has been no evidence or argument presented in support of this claim, the court will not address it further. Defendant's remaining arguments are fully addresssed in the text. Fourth, Defendant argues that "as a result of

14

at least ten days delay between issuance and execution of the search warrant of [Defendant's] alleged residence, any probable cause that could have arguably justified the issuance of the warrant had become stale, thereby negating the requisite probable cause." (Docket No. 29.)

### 1.  The Search Warrant Was Supported By Probable Cause To Believe That The Place To Be Searched Contained Incriminating Evidence.

Defendant challenges the search warrant in this case on its four corners, alleging that "any searches and seizures were conducted without the requisite probable cause to believe that the locations or persons to be searched had or contained incriminating evidence, and any warrant issued was not supported by probable cause." (Docket No. 29.) Searches conducted pursuant to a warrant are reviewed to determine whether the information in the warrant application and supporting affidavit provided probable cause for the search. Illinois v. Gates, 462 U.S. 213, 236 (1983). "Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place." United States v. Fladten, 230 F.3d 1083, 1085 (8th Cir. 2000) (citing Illinois v. Gates, 462 U.S. 213, 236 (1983)). A court does not evaluate each piece of information independently, but rather considers all of the facts for their cumulative meaning. United States v. Allen, 297 F.3d 790, 794 (8th Cir. 2002). The task of a court issuing a search warrant is "simply to make a practical, common sense decision whether, given all the circumstances set forth in the affidavit . . . including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." Gates, 462 U.S. at 238; see also United States v. Salter, 358 F.3d 1080, 1084 (8th Cir. 2004).

15

In reviewing the decision of the issuing court, this Court must ensure that the issuing court "had a 'substantial basis for . . . conclud[ing] that probable cause existed.'" United States v. Oropesa, 316 F.3d 762, 766 (8th Cir. 2003) (quoting Gates, 462 U.S. at 238-39.) Since reasonable minds may differ on whether a particular search warrant affidavit establishes probable cause, the magistrate's determination is accorded great deference. U.S. v. Wajda, 810 F.2d 754, 760 (8th Cir. 1987) (citing United States v. Leon, 468 U.S. 897, 914 (1984)).

In the present case, looking at the totality of the circumstances, a reasonable person could believe there was a fair probability that contraband or evidence of narcotics trafficking would be found at ███████████. See United States v. Fladten, 230 F.3d 1083, 1085 (8th Cir. 2000) (citing Illinois v. Gates, 462 U.S. 213, 236 (1983)). The CI informed Officer Nelson that Defendant was residing at ███████████ and was selling narcotics from that location. Officer Nelson conducted an independent investigation to determine whether Defendant lived at ███████████ Officer Nelson discovered that Defendant listed ███████████ as his address when he was arrested for aggravated assault on December 27, 2005. Officer Nelson subpoenaed Xcel Energy regarding the subscriber information for that address, and discovered that Ebony Brown was listed as the subscriber on the account. Officer Nelson further confirmed that Ebony Brown was Defendant's girlfriend by reviewing Sgt. Bergren's report.

In addition to confirming that Defendant lived at ███████████ Officer Nelson also conducted a controlled buy of narcotics from Defendant at ███████████ within 48 hours of applying for the search warrant. Looking at the totality of the circumstances in the present case, a reasonable person could believe that there was a fair probability that evidence of narcotics trafficking would be found at ███████████ Therefore, Defendant's motion to suppress the

16

evidence obtained as a result of the search warrant should be denied, because the search warrant was issued based on probable cause to believe that evidence of narcotics trafficking would be uncovered at ████████████

### 2.    The No-Knock Provision in the Warrant Was Permissible

Defendant argues that the search violated the Fourth Amendment requirement "that police knock and announce their presence prior to entering the premises, and the warrant was not supported by the requisite reasonable suspicion to support an authorization to ignore the knock and announce requirement." (Docket No. 29.)

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures." U.S. CONST. AMEND. IV. The Eighth Circuit stated that "[t]he Fourth Amendment does not forbid no-knock searches. Rather, it requires that searching officers justify dispensing with the knock-and-announce requirement." United States v. Scroggins, 361 F.3d 1075, 1081 (8th Cir.2004) (citing Richards v. Wisconsin, 520 U.S. 385, 391 (1997)). A no-knock entry can be justified where police officers "show they had a reasonable suspicion that knocking and announcing . . . under the particular circumstances would threaten officer safety, be futile, or inhibit the investigation of the crime . . . [t]his showing is 'not high,' but is one that the police must . . . make when the defendant challenges the reasonableness of a no-knock search." Id. (quoting Richards, 520 U.S. at 394-95.)

The Eighth Circuit has noted that "[t]he showing the police must make to obtain a no-knock warrant is the same showing they must make to justify their own decision to dispense with the knock-and-announce requirement. Only the timing differs." Id. at 1082. The Eighth Circuit further stated that, "[a]lthough the standards are the same regardless of whether the police visit a judge

before or after they search, if they do so beforehand, and the judge is wrong, the police can rely upon the *Leon* good-faith exception." Id.

Assuming without deciding that the no-knock search violated the Fourth Amendment, the Court must address "the separate question of whether the exclusionary rule applies to the seized evidence." Id. at 1083. The good-faith exception to the exclusionary rule provides that evidence will not be excluded where police officers reasonably rely on a search warrant issued by a neutral judicial officer, where that search warrant is later declared invalid. See United States v. Leon, 468 U.S. 897, 925-26 (1984). "An officer's good faith is judged by whether the officer's reliance was 'objectively reasonable.'" Scroggins, 361 F.3d at 1083 (quoting Leon, 468 U.S. 919-20.) There are several situations in which the good faith exception does not apply; however, none of those situations is presently before the Court.

The Eighth Circuit has stated that

[t]he good-faith exception is perfectly suited for cases [where] . . . the judge's decision was borderline . . . The exclusionary rule's purpose is deterrence. That purpose would not be served by excluding evidence when . . . the police take a close call to a judge before searching, even if a reviewing court ultimately concludes that the judge got it wrong.

Scroggins, 361 F.3d at 1084.

In the present case, assuming without deciding that the no-knock search warrant authorized by the state court violated the Fourth Amendment, the exclusionary rule does not apply to the evidence seized in this case. The St. Paul police officers involved in the search of ███████████ ███ reasonably relied on the search warrant issued by the state court judge, and their reliance was objectively reasonable. Therefore, the good faith exception to the exclusionary rule applies to the facts of the present case, and the evidence seized pursuant to the warrant is admissible.

### 3.   The Search Warrant Was Not Stale When it Was Executed

Defendant argues that "as a result of at least ten days delay between issuance and execution of the search warrant of [Defendant's] alleged residence, any probable cause that could have arguably justified the issuance of the warrant had become stale, thereby negating the requisite probable cause." (Docket No. 29.)

The Eighth Circuit has noted that

> There is no bright-line test for determining when information is stale. Whether the averments in an affidavit are sufficiently timely to establish probable cause depends on the particular circumstances of the case, and the vitality of probable cause cannot be quantified by simply counting the number of days between the occurrence of the facts supplied and the issuance of the affidavit . . . Time factors must be examined in the context of a specific case and the nature of the crime under investigation.

United States v. Koelling, 992 F.2d 817, 822 (8th Cir.1993) (internal citation omitted). In United States v. Tyler the defendant argued that the search warrant was invalid because the police used stale evidence to establish probable cause. 238 F.3d 1036, 1039 (8th Cir.2001). Specifically, the defendant in Tyler argued that, in the affidavit in support of the search warrant, the police stated "that they had made a controlled buy of cocaine from [defendant] within the past 7 months" and that the search warrant was invalid because this evidence was stale. Id. The Eighth Circuit rejected the defendant's argument, stating

> [t]he police in this case presented the facts of their controlled cocaine buy from [defendant] as a part of their proof that they were familiar with [defendant's] drug dealings. We do not believe that it would have been unreasonable to think that these facts validated [the confidential informant's] disclosures, and that a search might well uncover evidence of crimes by [defendant], such as records of drug transactions or information with respect to other drug offenders.

Id.

As stated by the Eighth Circuit, in order to determine whether the search warrant was invalid because it was based on stale evidence, the Court must take into consideration the particular circumstances of the case and determine whether the averments in the affidavit were sufficiently timely to establish probable cause. In the present case, Officer Nelson noted that a controlled buy had taken place, at ███████████, within the previous 48 hours. As in <u>Tyler</u>, the controlled buy conducted by the confidential informant validated the disclosures by the confidential informant that Defendant was selling cocaine from his residence at ███████████. Unlike the situation in <u>Tyler</u>, the controlled buy, which validated the CI's disclosures, was conducted within two weeks of the execution of the search warrant, rather than within the past seven months. Like the holding in <u>Tyler</u>, it was not unreasonable to believe that a search of ███████ might uncover evidence of the crime of narcotics trafficking, perpetrated by Defendant. In light of all the facts and circumstances in the present case, the probable cause that supported the issuance of the warrant on February 17, 2006, was still present at the time the warrant was executed on February 27, 2006, and therefore the probable cause that supported the execution of the warrant was not stale. The Court recommends that Defendant's Motion to suppress evidence obtained as a result of search and seizure be denied.

### D. The Police Had Probable Cause to Arrest Defendant Outside of ███████

Finally, Defendant argues, in his motion to suppress that "the police lacked probable cause to arrest [Defendant], thereby requiring suppression of all evidence obtained as a result of his arrest." (Docket No. 29.) In order to establish probable cause to effectuate a warrantless arrest, "the facts and circumstances within the officers' knowledge must be sufficient to justify a reasonably prudent person's belief that the suspect has committed or is committing an offense." <u>United States v.</u>

Roberson, 439 F.3d 934, 939 (8th Cir.2006). When "reviewing the . . . officers' determination of probable cause, [the Court] look[s] at the totality of the circumstances and give[s] due weight to the inferences that can be drawn from the officers' experience." Id. Probable cause is "based on the collective knowledge of all the officers involved." United States v. Briley, 726 F.2d 1301, 1305-06 (8th Cir.1984).

The Fourth Amendment prohibits law enforcement from conducting a search unless the search is permitted by a search warrant, issued by a neutral judicial officer. However, there are exceptions to the warrant requirement, and one such exception relates to a search incident to a lawful arrest. In Chimel v. California, the Supreme Court held that "[t]here is ample justification . . . for a search of the arrestee's person and the area 'within his immediate control'-construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence." 395 U.S. 792, 763 (1969). In order to effectuate a lawful search incident to arrest, the search must be confined to the area of the arrestee's immediate control and the search must be "contemporaneous" with the arrest. United States v. Morales, 923 F.2d 621, 627 (8th Cir.1991).

In the present case, the facts and circumstances in the officers' collective knowledge were sufficient to justify a reasonably prudent person's belief that Defendant had, at the very least, committed the crime of felon in possession of a weapon. The search warrant notes that Defendant had been convicted of at least one felony, and a firearm was discovered during the search of ██████, on top of documents that were addressed to Defendant. In addition, St. Paul police officers had engaged in a controlled purchase of crack-cocaine from Defendant, which was sufficient to justify a reasonably prudent person's belief that Defendant had engaged in the crime of narcotics trafficking. Finally, the officers secured a photograph of Defendant previous to the warrantless

21

arrest, and therefore the officers knew what Defendant looked like, and were capable of identifying him as he walked on the East side of the premises. Looking at the totality of the circumstances, probable cause existed to support the warrantless arrest of Defendant for the crimes of felon in possession and narcotics trafficking.

Since probable cause existed to support Defendant's warrantless arrest, the arrest was lawful. Since the arrest was lawful, officers could utilize the search incident to arrest exception to the warrant requirement and were permitted to search Defendant's person and the area within his immediate control for weapons or destructible evidence. Therefore, the search of Defendant that was conducted contemporaneously with his lawful arrest was valid, and all evidence seized pursuant to that search is admissible. The Court recommends that Defendant's motion to suppress the evidence seized as a result of the search conducted incident to his warrantless arrest be denied.

### III.   RECOMMENDATION

Based upon all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendant's Motion to suppress witness identifications [#27] be **DENIED**; that Defendant's Motion to suppress evidence from search and seizure [#29] be **DENIED**; and Defendant's Motion to Suppress Statements [#36] be **GRANTED**.

DATED: May 9, 2006

_____
FRANKLIN L. NOEL
United States Magistrate Judge

Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **[date 13 days from R&R date]**, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting

party's brief within ten days after service thereof. All briefs filed under the rules shall be limited to 3,500 words. A judge shall make a de novo determination of those portions to which objection is made.

Unless the parties are prepared to stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and cause to be filed by **[same date as above]** a complete transcript of the hearing.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.